**FIRST STATE BANK, HUBBARD, TEXAS, Appellant,**

v.

**W. Sale LEWIS, Savings & Loan Commissioner of Texas, et al., Appellees.**

**No. 5766.**

Court of Civil Appeals of Texas, Waco.

Dec. 15, 1977.

Rehearing Denied Jan. 12, 1978.

Jack C. Ogg, Sowell, Capps & Ogg, P. A., Houston, for appellant.

John L. Hill, Atty. Gen., Catherine A. Brown, Asst. Atty. Gen., John J. McKay, McKay & Wash, Austin, for appellees.

HALL, Justice.

The principal office of appellee Bi-Stone Savings & Loan Association is located in the City of Mexia, Limestone County, Texas. Bi-Stone made application to appellee Savings & Loan Commissioner of Texas to locate a branch office in the City of Hubbard, Hill County, Texas. The application was contested by appellant First State Bank of Hubbard, Texas. After a hearing, the Commissioner granted Bi-Stone's application. The Commissioner's order was affirmed by the trial court, and Bank brought this appeal. Bank seeks reversal on three points of error asserting (1) the public notices of the application and the hearing on the application did not meet the requirements of Rules 1.4 and 2.3 of the Rules And Regulations For Savings And Loan Associations and were fatally defective; (2) the Commissioner's finding of a public need for the proposed branch office was not reasonably supported by substantial evidence; and (3) Bi-Stone did not meet certain requirements under Rule 2.4 of the Rules And Regulations For Savings And Loan Associations for the granting of a branch application. We overrule these contentions and affirm the judgment.

■ Rules 1.4 and 2.3 of the Rules And Regulations For Savings And Loan Associations provide that notice of hearing of an application for a branch office "shall be published at least twenty (20) days before the date of hearing in a newspaper . . . of general circulation in the county [where the branch office will be located]." Bank contends the newspaper used by Bi-Stone in this case was not one of general circulation, and that the notice provision is mandatory and jurisdictional to the hearing by the Commissioner. The record shows without contradiction that Bank had notice and participated in the hearings at all relevant times. Bank does not assert otherwise. Rather, the thrust of Bank's complaint is that because of noncompliance with the notice requirement constitutional due process was denied unnamed members of the public at large who did not receive notice and were thereby denied the opportunity to appear and contest the application. Bank has not shown how it was harmed by this asserted wrong to others. The general rule in constitutional litigation, applicable here, is that one may not assert the rights of third parties. Bank has no standing to raise the point in issue. *Moody v. State*, 538 S.W.2d 158, 160 (Tex.Civ.App.—Waco 1976, writ ref'd n. r. e.). In any event, our review of the evidence convinces us that the Commissioner's finding that the newspaper in question was one of general circulation in Hill County is supported by substantial evidence.

■ The Commissioner found there is a public need for the proposed branch office. The evidence on this question came from the testimony of Bi-Stone's president, Bi-Stone's expert economist-witness, Bank's expert economist-witness, and exhibits prepared by those witnesses and explained by them. Basically, it was the opinion of Bank's witness that if located in the City of Hubbard the branch office would serve only the 1,500 residents of that city. It was the opinion of Bi-Stone's witnesses that Hubbard is the center of a substantially large agri-business community located in part of Hill, Limestone, McLennan and Navarro Counties served in its financial needs only by several small banks (of which appellant bank is the largest) which cannot and do not offer long-term mortgage loans, interest rates, and savings benefits accorded the

public by savings and loan associations, and that there is an existing public need and ready market for those services in the area. The Commissioner chose to believe and accept the proof supporting the latter theory. Of course, the record in this case relates to the peculiar area in question and we see little purpose and no precedential value to be served by detailing the proof in this opinion. Our review of the entire record convinces us that the Commissioner's finding of public need is supported by substantial evidence.

The Texas Savings and Loan Act is codified as article 852a, Vernon's Ann.Civ.St. In its pertinent parts this statute provides as follows:

"Sec. 7.01. Each association shall close its books on the last business day of June and December of each year, . . . for the purpose of determining the gross income of the association for the period since the date of the last such closing of its books and from which shall be deducted the expenses of operating the association for such period, the balance remaining being the net income for the period.

"Sec. 7.02. If, at the date of any closing of its books, the loss reserves of an association equal an aggregate amount of less than five per cent (5%) of its savings liability, then an amount equal to at least five per cent (5%) of its net income, or so much thereof as may be necessary to increase its loss reserves to the above required amount, shall be transferred from the net income of the association to its loss reserves. In the event that any credit to the loss reserves of an association is made following the effective date of this Act in excess of the minimum five per cent (5%) requirement the dollar amount of such excess may be carried over as a credit toward the minimum requirement for any subsequent accounting period.

"Sec. 7.03. After providing for payment of the expenses of operation of the association and for the required minimum transfer to its loss reserves, the board of directors of the association may declare dividends on savings accounts.

"Sec. 7.04. The balance of net income of the association, if any, may be credited to a surplus account, from which the board of directors of any association whose bylaws provide for the issuance of Permanent Reserve Fund Stock, and which has such stock outstanding, may, at their discretion, and at such times as they may determine, declare and pay dividends in cash or additional stock to the holders of record of such stock outstanding at the date such dividends are declared.

"Sec. 7.05. Any association at any closing date may use all or any part of any surplus accounts, whether earned or paid-in, or any expense fund contributions on its books at such time to meet all or any part of the expenses of operating the association for the period just closed, required transfers to loss reserves, or the payment or credit of dividends declared on savings accounts."

Under § 2.4 of the Rules And Regulations For Savings And Loan Associations the Commissioner is required to find (among other things) as predicates for the granting of a branch application that:

"(a) the aggregate amount of the loss reserves, surplus and Permanent Reserve Fund Stock, if any, of the applying association is equal to three per cent (3%) of its savings liability;

"(b) the applying association has had *a profitable operation* for the three year period next preceding the filing of such application after paying operating expense, *making statutory allocations to loss reserves*, and paying dividends on savings accounts out of its earnings during such period." (emphasis added).

The Commissioner made express findings in favor of Bi-Stone under these Rules. Bank asserts that the finding under paragraph (b) that Bi-Stone had "a profitable operation" for the required period "after making statutory allocations to loss reserves" does not have support in the evidence.

Bank's contention is based upon its construction of § 7.02 of article 852a, supra. It says that this statute requires an association at each closing of its books to transfer at least 5% of its net income, or so much *more* of its *net income* (up to 100%) as may be necessary to increase and maintain the association's loss reserves to an aggregate amount of 5% of its savings liability. If this construction is correct, then our record shows without contradiction that it was not met by Bi-Stone during the three years immediately preceding the filing of the branch application in question, and that Bi-Stone would not have had a profitable operation during that period if such allocation had been made to its loss reserves. The Commissioner's finding under Rule 2.4 (b) would, accordingly, be erroneous.

Oppositely, Bi-Stone and the Commissioner assert that § 7.02 of the statute requires only that an association upon closing its books transfer (1) at least (that is, a required minimum) of 5% of its net income to loss reserves if, at the time of closing, the association's loss reserves do not equal an aggregate amount of 5% of its savings liability, or transfer (2) a lesser amount than 5% of its net income (that is, that the phrase "or so much thereof" as used in the statute means "*so much of 5% of net income*," rather than "*so much of net income*") if the lesser amount would increase the association's loss reserves to 5% of its savings liability. If this construction is correct, then the undisputed evidence on the question supports the Commissioner's finding of profitable operation by Bi-Stone after statutory allocation to loss reserves during the period required under Rule 2.4.

 We agree with the construction asserted by Bi-Stone and the Commissioner. We believe this construction is the legislative intent expressed in the over-all language of the statute. The statute does not prohibit an association from transferring a larger amount than 5% of its net income to loss reserves (as our record shows Bi-Stone has done in the past), but it sets what is denominated in §§ 7.02 and 7.03 as a "required minimum transfer" of 5% of net income. Provision is then made for use of the net income remaining after the required minimum transfer for payment of dividends on savings account, credit to surplus account, and payment of stock dividends. Additionally the record shows, as does Savings And Loan Rule 2.4, (a), supra, that this is the construction which has been placed on the statute in the past by the Commissioner and other regulatory authorities of the Savings and Loan Section of the Finance Commission of Texas who are charged with auditing the operations of savings and loan associations and enforcing the requirements of the Savings and Loan Act. The courts will ordinarily adopt and uphold a construction placed on a statute by an executive officer or department charged with its administration if the statute is ambiguous or uncertain and if the construction so given it is not unreasonable. 53 Tex.Jur.2d 259, Statutes, § 177.

Bank's points and contentions are overruled. The judgment is affirmed.